MOORE, Circuit Judge
(concurring):
I concur in affirming the order denying appellant’s petition to vacate his conviction but differ in my reasons in one, to me, important respect. I do not agree that the Government’s role with respect to the $80,-000 was “ambiguous” or that this incident and the enlargement of bail incident represented “a mere drop in the bucket”. However, whether they would have caused the bucket to overflow is quite another matter.
I believe that Judge Brieant’s finding, as follows, is clearly supported by the record:
“(1) the Government prevented Sammy Feet [Hellerman’s co-conspirator in the Natco fraud] from stealing the $80,000 in Natco funds by freezing the proceeds of the check which Schustek and Feet had caused to be deposited in the Bahamas casino . . .; (2) Hellerman and Schustek did reveal the full story of the Natco swindle, including their own participation, to the Government, thereby making the Government fully aware of the intended goal of Natco’s bankruptcy, before it released the $80,000 to Kurland [the lawyer who presented a handwritten retainer signed by Schustek to the Government in order to obtain the funds “on behalf of Natco”]; (3) the Government was aware before it reached its decision to release the funds to an attorney authorized by Schustek, that Heller-man desperately needed this money to pay off loansharks who were threatening his life. .
“In the face of all of this, the Government released the funds [the $80,000] to . Kurland . . . without investigating either Kurland or his intentions, or those of Schustek with respect to the $80,000.00. In addition, the Government made no effort to ascertain whether Natco was actually then bankrupt (which it was as of January 26, 1971 . . .) or whether the intended fraud was sufficiently advanced so that the seized money could be held in the Government’s possession as evidence, or to prevent its theft by Hellerman.
“Hellerman expressed his own belief, at the evidentiary hearing and in [Wall Street Swindler], that the Government intentionally allowed him to retrieve the $80,000.00 thus conferring a substantial benefit on him. .
“. . . The Court finds, as it must based on the record before it, that it should have been readily apparent to the Government, when it did release these funds, that the money inevitably would end up in Hellerman’s pocket. In effect, the Government chose to look the other way. While denying Hellerman’s direct request for the money, the Government accorded him the opportunity to gain possession of it indirectly by the charade of having the corporation’s ‘attorney’ demand and receive it for deposit in a corporate bank account. By conscious avoidance the Government thus intentionally eased the way for Hellerman to benefit from its decision to release the $80,000.00 in stolen funds. . . . ” (District Court’s Findings, Appendix at 318-19) (footnote omitted).
I also believe that the Brady request was ‘specific”,[1] that these disclosures were em *790 braced within the Brady doctrine, were material, and should have been disclosed. Had there been no other evidence reflecting on Hellerman’s credibility, these governmental favors would, in my opinion, have been admissible and material to that important issue.
However, Hellerman’s credibility had been subjected to a devastating barrage, set forth in detail by Judge Brieant and incorporated in Judge Mansfield’s opinion. Since we are faced, in reality, with the speculation of what the jury — or even one juror — would have done had this information been presented, we cannot, under the law, speculate, but must substitute well-reasoned judgment therefor. Searching retroactively into the composite mind of the jury, I, too, come to the conclusion that the addition of these withheld facts would not have created a reasonable doubt, in view of all the evidence before them, of Ostrer’s guilt — hence, I would affirm.

. That the request was made by Ostrer’s co-defendant and not Ostrer himself, is, in my view, immaterial, given the function of the request— i. e., to ease the prosecutor’s task of determining the “materiality” of exculpatory evidence in the context of the case, Agurs, 427 U.S. at 106-07, 96 S.Ct. 2392 — and given the fact that copies of the motion papers were sent to Ostrer’s counsel as well as to the court and the prosecutor. The motion, moreover, had requested a pretrial conference for the purpose of obtaining a Brady order. Ostrer’s counsel and the court might well have believed that the co-defendant’s request in this multi-defendant proceeding would be sufficient to protect the Brady rights which were shared by Ostrer and *790 co-defendant Dioguardi, both of whose convictions would be dependent, in large part, on the jury’s assessment of Hellerman’s credibility.
Sound policy would seem to require that no hypertechnical lines be drawn in this area. To require identical requests in multi-defendant trials would inundate the courts and the prosecutor’s office with requests which would serve no useful purpose. Once the prosecutor is on notice that certain materials are deemed sufficiently “material” to one co-defendant to require their production, his legal duty to provide those materials has crystallized, regardless of who the movant may have been. “Pretrial discovery,” we have said in the past, “should be approached with a spirit of cooperation among court and counsel in order to prevent burdensome recesses and also, we should emphasize, to protect the government against . claims of suppression of material and favorable evidence . . . United States v. Percevault, 490 F.2d 126, 132 (2d Cir. 1974). I would not limit a prosecutor’s constitutional duty to disclose when his duty is brought home to him by any one defendant’s request.